UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

DAVID BOLLINGER,

                     Petitioner,

    v.

RENEE BAKER, *et al.*,

                  Respondents.

Case No. 2:98-cv-01263-MMD-PAL

ORDER

## I.      INTRODUCTION

This action is a petition for a writ of habeas corpus by David Bollinger, a Nevada prisoner sentenced to death. The case is before the Court with regard to the merits of the claims remaining in Bollinger's third amended habeas petition. In this order, the Court denies Bollinger's remaining claims, and orders that judgment be entered accordingly. The Court grants Bollinger a certificate of appealability with respect to a procedural issue resolved in an earlier order.

## II.      BACKGROUND FACTS AND PROCEDURAL HISTORY

The following is from the Nevada Supreme Court's August 24, 1995, opinion on Bollinger's direct appeal:

> David A. Bollinger ("Bollinger") was convicted of two counts of murder in the first degree for killing Rose and James Vertrees ("the Vertreeses"), two counts of kidnapping, two counts of robbery, and one count of burglary. Bollinger, and possibly an accomplice identified as Tom Johnston ("Johnston"), robbed the Vertreeses in their motor home in Reno. After beating the Vertreeses to death, Bollinger, or he and Johnston, set fire to the Vertresses' bodies at a rest-stop in Rifle,

Colorado. [Footnote: Johnston's name came up occasionally at trial. Although this shadowy character may have participated in the crimes, the State suggested that possibly only Bollinger committed the crimes. Indeed, police officers never found Johnston or proof of his existence.] After being arrested in Colorado, Bollinger placed a tattoo on his shoulder which read "Pyro," the nickname inmates had given him.

\* \* \*

During the sentencing phase of Bollinger's trial, many witnesses testified that Rose Vertrees ("Rose") was a very caring, generous person. While Rose was in good health, family members suspected that James Vertrees ("James") was suffering from Alzheimer's Disease. The State characterized James, who had recently been imprisoned with Bollinger, as "definitely a different person. A tough man to live with." Bollinger elicited testimony that Rose and James had recently been divorced, although they continued to live together in the motor home.

The State also called as a witness Ernest Lee Meyers ("Meyers"), a ten-time felon who was incarcerated with Bollinger. Before allowing the jury to hear Meyers' testimony, Meyers related to the district court that he tattooed Bollinger's shoulder at Bollinger's request. Meyers stated, "I don't remember the whole — whole ordeal pertaining to that. I was back there putting on tattoos, and he asked for a tattoo. And I asked him what he wanted, and he said, 'I don't know. Give me my nickname.'" Meyers then testified to similar effect before the jury.

On cross-examination, Meyers also claimed that Bollinger told him that he was guilty. Meyers related that Bollinger told him that Bollinger hit James in the head with a pipe in Reno, but did not intend to kill him. Bollinger said that he and Johnston then drove the motor home, with Rose and James held hostage, from Reno to Colorado. According to Bollinger, when the two discovered that James was dead, Johnston killed Rose.

The district court admitted a photo of the tattoo into evidence, having refused to do so during the guilt phase of the trial. The district court also admitted a certified copy of Bollinger's prior conviction for grand larceny and order revoking probation.

\* \* \*

With respect to Rose's murder, the jury found Bollinger worthy of death. In support of this finding, the jury found no mitigating factors but selected all three possible aggravating factors: (1) Bollinger was under sentence of imprisonment at the time, (2) Bollinger committed the crime while engaged in or in flight from a robbery, burglary, or kidnapping, and (3) the murder was committed to avoid lawful arrest.

With respect to James' murder, the jury found that Bollinger should be imprisoned for life without the possibility of parole. In support of this finding, the jury found the following two mitigating factors: (1) Bollinger had no significant criminal history, and (2) "other mitigating circumstance" existed. In addition, the jury did not select any of the three possible aggravating factors that it selected regarding Rose's murder.

*Bollinger v. State*, 901 P.2d 671, 672-74 (Nev. 1995).

2

1   The Nevada Supreme Court affirmed the judgment of conviction and death

2   sentence on August 24, 1995. *Bollinger*, 705 P.2d at 676.

3   Bollinger filed his first state-court habeas corpus petition on September 12, 1996.

4   Exh. 263.[1] The state district court held an evidentiary hearing on March 3 and 4, 1997.

5   Exhs. 267, 281. The petition was denied on May 7, 1997. Exh. 270. Bollinger appealed.

6   Exhs. H, I, J. The Nevada Supreme Court dismissed the appeal on July 28, 1998. Exh.

7   269.

8   Bollinger then initiated this federal habeas corpus action on September 9, 1998.

9   Counsel was appointed, discovery proceedings ensued, and a first amended habeas

10  petition (dkt. no. 39) was filed on February 29, 2000. After extensive discovery

11  proceedings, Bollinger filed a second amended habeas petition (dkt. no. 110) on

12  October 29, 2004. On June 22, 2005, respondents filed a motion to dismiss and motion

13  for summary judgment (dkt. nos. 124, 125, 126), asserting that several claims in the

14  second amended petition were not exhausted in state court. Then, on October 5, 2005,

15  the parties submitted a stipulation to stay the case pending Bollinger's exhaustion of

16  claims in state court (dkt. no. 130). The Court approved that stipulation, and stayed this

17  action on October 13, 2005 (dkt. no. 130).

18  On November 14, 2005, Bollinger filed a second state-court habeas petition. Exh.

19  273. The State moved to dismiss. Exh. 283. The state district court dismissed the

20  petition on October 10, 2007. Exh. 290.  Bollinger appealed. Exhs. 292, 293, 294. The

21  Nevada Supreme Court affirmed the state district court's ruling on September 20, 2011.

22  Exh. 295. Rehearing was denied on December 20, 2011. Exh. 297.

23  ///

24

25      [1]Exhibits identified in this order only by number (e.g. "Exh. 1") are exhibits filed by
    Bollinger and located in the record at dkt. nos. 169-208, and 226. Exhibits identified in
26  this order by "R" followed by a number (e.g. "Exh. R1") are exhibits filed by respondents
    and located in the record at dkt. nos. 20-34.  Exhibits identified in this order only by letter
27  (e.g. "Exh. A") are further exhibits filed by respondents and located in the record at dkt.
    no. 217.

28

1    On March 12, 2012, the stay of this federal habeas action was lifted (dkt. no.

2    152). On September 14, 2012, Bollinger filed a third amended petition for writ of habeas

3    corpus (dkt. no. 168), which is now the operative petition in this case.

4    On March 12, 2013, respondents filed motions to dismiss and for partial

5    summary judgment (dkt. nos. 215, 216). On December 20, 2013, the Court ruled on

6    those motions, denying the motion for summary judgment, and granting the motion to

7    dismiss in part and denying it in part. Order entered December 20, 2013 (dkt. no. 232).

8    The Court ruled that the following claims in Bollinger's third amended habeas petition

9    are barred by the procedural default doctrine: Claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,

10   13, 14A, 14B, 14C, 14D, 14E, 14G, 15, 16, 17, all of Claim 18 except the claims that

11   Bollinger's appellate counsel was ineffective for failing to raise a claim that the trial court

12   did not have jurisdiction and that Bollinger's appellate counsel was ineffective for failing

13   to raise a claim that the transfer of Bollinger's case from Colorado to Nevada resulted in

14   a violation of Bollinger's right to a speedy trial, and all of Claim 19. *Id.* at 17-20. The

15   Court dismissed those claims, leaving the following claims to be adjudicated on their

16   merits: Claim 14F, and Claim 18 to the extent it asserts claims that Bollinger's appellate

17   counsel was ineffective for failing to raise a claim that the trial court did not have

18   jurisdiction and that Bollinger's appellate counsel was ineffective for failing to raise a

19   claim that the transfer of Bollinger's case from Colorado to Nevada resulted in a

20   violation of Bollinger's right to a speedy trial. *Id.*

21   Respondents filed an answer on April 2, 2014 (dkt. no. 236), responding to the

22   claims remaining in Bollinger's third amended habeas petition. Bollinger filed a reply on

23   June 19, 2014 (dkt. no. 241).[2]

24   _____

25   [2]The scheduling order in effect in the case (Order entered April 3, 2012 (dkt. no.
     154)), allowed for respondents to file a response to Bollinger's reply. Respondents did
     not file a response to Bollinger's reply within the time allowed. On November 18, 2014,

26   Bollinger filed a request for a status conference, requesting a status conference "to
     confirm that the State does not intend to file a response to his reply and to discuss the

27   progress of the case." Request for Status Conference (dkt. no. 242) at 1. Such a status
     conference is unnecessary. There is no need for a response to Bollinger's reply. The

28   *(fn. cont...)*

4

1    III.    **STANDARD OF REVIEW**

2           Because this action was initiated after April 24, 1996, the amendments to 28

3    U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act

4    (AEDPA) apply. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*,

5    212 F.3d 1143, 1148 (9th Cir.2000), *overruled on other grounds by Lockyer v. Andrade*,

6    538 U.S. 63 (2003). Section 2254(d) sets forth the primary standard of review under

7    AEDPA:

8                    An application for a writ of habeas corpus on behalf of a person in
             custody pursuant to the judgment of a State court shall not be granted with
9            respect to any claim that was adjudicated on the merits in State court
             proceedings unless the adjudication of the claim —
10
                    (1) resulted in a decision that was contrary to, or involved an
11           unreasonable application of, clearly established Federal law, as
             determined by the Supreme Court of the United States; or
12
                    (2) resulted in a decision that was based on an unreasonable
13           determination of the facts in light of the evidence presented in the State
             court proceeding.
14

15   28 U.S.C. § 2254(d).

16          A state court decision is contrary to clearly established Supreme Court

17   precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a

18   rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the

19   state court confronts a set of facts that are materially indistinguishable from a decision

20   of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme

21   Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362,

22   405-06 (2000)) (internal quotation marks omitted).

23          A state court decision is an unreasonable application of clearly established

24   Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state

25   court identifies the correct governing legal principle from [the Supreme Court's]

26   _____

27   *(…fn. cont.)*
     Court will deny Bollinger's request for a status conference, and will rule on the merits of
28   his remaining claims.

1   decisions but unreasonably applies that principle to the facts of the prisoner's case."

2   *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413) (internal quotation marks

3   omitted). The "unreasonable application" clause requires the state court decision to be

4   more than incorrect or erroneous; the state court's application of clearly established law

5   must be objectively unreasonable. *Id.* (citing *Williams*, 529 U.S. at 409).

6       The Supreme Court has further instructed that "[a] state court's determination

7   that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

8   could disagree' on the correctness of the state court's decision." *Harrington v. Richter*,

9   562 U.S. 86, 131 S.Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652,

10  664 (2004)). The Supreme Court stated that "even a strong case for relief does not

11  mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer*, 538

12  U.S. at 75); *see also Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398 (2011)

13  (AEDPA standard is "a difficult to meet and highly deferential standard for evaluating

14  state-court rulings, which demands that state-court decisions be given the benefit of the

15  doubt" (internal quotation marks and citations omitted)).

16      The state court's "last reasoned decision" is the ruling subject to section 2254(d)

17  review. *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir.2010). If the last reasoned

18  state-court decision adopts or substantially incorporates the reasoning from a previous

19  state-court decision, a federal habeas court may consider both decisions to ascertain

20  the state court's reasoning. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir.2007)

21  (en banc).

22      If the state supreme court denies a claim but provides no explanation for its

23  ruling, the federal court still affords the ruling the deference mandated by section

24  2254(d); in such a case, the petitioner is entitled to habeas relief only if "there was no

25  reasonable basis for the state court to deny relief." *Harrington*, 131 S.Ct. at 784.

26      The analysis under section 2254(d) looks to the law that was clearly established

27  by United States Supreme Court precedent at the time of the state court's decision.

28  *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Additionally, in considering the petitioner's

1  claims under section 2254(d), the federal court takes into account only the evidence

2  presented in state court. *Pinholster*, 131 S.Ct. at 1400-01.

3        If the petitioner meets the standard imposed by section 2254(d), the federal court

4  may then allow factual development, possibly including an evidentiary hearing, and the

5  federal court's review, at that point, is *de novo. See Panetti v. Quarterman*, 551 U.S.

6  930, 948 (2007); *Wiggins*, 539 U.S. at 528-29; *Runningeagle v. Ryan*, 686 F.3d 758,

7  785-88 (9th Cir. 2012).

8  **IV.    ANALYSIS**

9        **A.    Claim 14F**

10       In Claim 14F, Bollinger claims that a jury instruction given at his trial, in both the

11 guilt phase and the penalty phase, was unconstitutional. Third Amended Petition for

12 Writ of Habeas Corpus (dkt. no. 168), at 160-62. The jury instruction at issue was as

13 follows:

14            A reasonable doubt is one based on reason. It is not mere possible
        doubt, but is such a doubt as would govern or control a person in the more
15      weighty affairs of life. If the minds of the jurors, after the entire comparison
        and consideration of all the evidence, are in such a condition that they can
16      say they feel an abiding conviction of the truth of the charge, there is not a
        reasonable doubt. Doubt to be reasonable, must be actual, not mere
17      possibility or speculation.

18 Exh. 251, Instruction 4; Exh. 257, Instruction 10. Bollinger argues that this instruction

19 "inflates the constitutional standard of doubt necessary for acquittal, and the giving of

20 this instruction created a reasonable likelihood that the jury would convict and sentence

21 based upon a lesser standard of proof than the federal Constitution requires." Third

22 Amended Petition for Writ of Habeas Corpus at 160-61.

23       The Nevada Supreme ruled on this claim, on Bollinger's direct appeal, as follows:

24            Bollinger argues that the district court erred in improperly instructing
        the jury concerning reasonable doubt. Bollinger argues that the "more
25      weighty affairs" portion of the instruction is misleading because a decision
        concerning the more weighty affairs of our lives involves an element of
26      risk-taking, while a decision to convict is always retrospective, concerned
        only with resolving conflicting versions of factual propositions. Bollinger
27      relies upon persuasive language found in *Victor v. Nebraska*, 511 U.S. 1,
        114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), and *State v. Ireland*, 773 P.2d
28      1375 (Utah 1989), to support this argument.

In *Lord v. State*, 107 Nev. 28, 38, 806 P.2d 548, 552 (1991), we upheld over constitutional challenge the "abiding conviction" element of Nevada's reasonable doubt instruction. We did not scrutinize the "more weighty affairs" language presently under review. Nevertheless, we note that our "proper inquiry is not whether the instruction 'could have' been applied in unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it." *Victor*, 511 U.S. at ___, 114 S.Ct. at 1243 (emphasis in original). We believe in Bollinger's case that no such likelihood exists. We note that in *Ireland* the Supreme Court of Utah found use of the language Bollinger now questions to be harmless because two other jury instructions (concerning the State's burden of proof and the presumption of innocence) were also offered. *Ireland*, 773 P.2d at 1380. Similar instructions were also offered in Bollinger's case.

*Bollinger*, 901 P.2d at 674. In a footnote, the Nevada Supreme Court added:

We note that the Supreme Court of Utah, acting in its "supervisory capacity," directed trial courts to discontinue use of the more weighty affairs language in defining reasonable doubt. *Ireland*, 773 P.2d at 1380. Because the definition of reasonable doubt found in NRS 175.211 incorporates the more weighty affairs language, we feel that the task of discontinuing the use of this language in Nevada is best initiated by the legislature. Bollinger recommends the following definition of reasonable doubt endorsed by the Federal Judicial Center:

[T]he government has the burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely true than not true. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

Federal Judicial Center, Pattern Criminal Jury Instructions 17-18 (1987) (instruction 21). We feel that adoption of such a definition would forestall future challenges to the more weighty affairs language of reasonable doubt jury instructions derived from NRS 175.211.

*Bollinger*, 901 P.2d at 674 n.2.

In *Ramirez v. Hatcher*, 136 F.3d 1209, 1214 (9th Cir.), *cert. denied*, 525 U.S. 967 (1998), the Ninth Circuit Court of Appeals held this same Nevada jury instruction to be

1     constitutional. And subsequently, in 2000, in a capital habeas corpus case, the Ninth

2     Circuit Court of Appeals ruled that the law of this circuit forecloses a claim such as this,

3     regarding this jury same instruction, and held the issue to be unworthy of a certificate of

4     appealability. *See Nevius v. McDaniel*, 218 F.3d 940, 945 (9th Cir.2000). In *Nevius*, the

5     court of appeals stated:

6          The claim that led us to grant Nevius permission to file a second
         petition was that the reasonable doubt instruction given at his trial was
7        unconstitutional under the standard later set by the Supreme Court in
         *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
8        That claim has been entirely undermined by our subsequent decision in
         *Ramirez v. Hatcher*, 136 F.3d 1209 (9th Cir.), *cert. denied*, 525 U.S. 967,
9        119 S.Ct. 415, 142 L.Ed.2d 337 (1998). There we upheld the
         constitutionality, under *Cage* and *Victor v. Nebraska*, 511 U.S. 1, 114
10       S.Ct. 1239, 127 L.Ed.2d 583 (1994), of a Nevada reasonable doubt
         instruction identical to the one given at Nevius's trial. The law of this circuit
11       thus forecloses Nevius's claim that his reasonable doubt instruction was
         unconstitutional.

12

13          Nevius contends that *Ramirez* should not control his case because
         *Ramirez* did not involve a death penalty. *Ramirez*, however, focused
14       clearly on the words of the challenged instruction, and concluded that
         there was "no reasonable likelihood that the jury understood the
15       instruction" to lower the government's burden of proof below the level of
         reasonable doubt. *Ramirez*, 136 F.3d at 1214. That is the test that
16       Ramirez derived from *Cage* and *Victor*, both of which involved death
         sentences. *Ramirez* also recognized that, if there were a reasonable
17       likelihood that the jury understood the instructions to lower the
         government's burden below that of reasonable doubt, the writ would have
18       to issue; "there can be no harmless error in this context." *Ramirez*, 136
         F.3d at 1211. Nevius has offered neither authority nor reason to support
19       his contention that this standard of constitutionality would be any different
         for a death penalty case than for a case involving imprisonment. We
20       conclude that the district court did not err in rejecting Nevius's *Cage* claim,
         or in denying a certificate of appealability for lack of "a substantial showing
         of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

21

22     *Nevius*, 218 F.3d at 944-45.

23        In light of *Ramirez* and *Nevius*, Bollinger's claim is plainly without merit.[3] The

24     Nevada Supreme Court's denial of this claim was not contrary to, or an unreasonable

25     application of, clearly established federal law, as determined by the Supreme Court of

26     ///

27 ─────────────────────

28          [3]In his reply, Bollinger concedes that his claim is foreclosed by *Ramirez*; he
states that he asserts the claim "to preserve the issue." Reply (dkt. no. 241) at 41.

the United States. *See* 28 U.S.C. § 2254(d). The Court will deny Bollinger habeas corpus relief with respect to Claim 14F.

### B.      Claim 18 — Jurisdiction

Claim 18 is a claim that Bollinger's appellate counsel was ineffective. *See* Third Amended Petition at 195-98. Claim 18 includes a claim that Bollinger's appellate counsel was ineffective for failing to raise, on his direct appeal, the claims set forth in his third amended petition. *See id.* at 195. Therefore, Claim 18, when read together with Claim 2, includes a claim that Bollinger's appellate counsel was ineffective for failing to raise a claim that the trial court did not have jurisdiction. *See id.* at 58-62.

The Nevada Supreme Court ruled on this claim, on the appeal in Bollinger's first state habeas action, as follows:

> To establish ineffective assistance of counsel, a claimant must show both that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. *Kirksey v. State*, 112 Nev. 980, 987, 923 P.2d 1102, 1107 (1996) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). To show prejudice, the claimant must show a reasonable probability that but for counsel's errors the result of the proceeding would have been different. *Id.* at 988, 923 P.2d at 1107. We conclude that appellant fails to show that his counsel performed deficiently or that he was prejudiced.
>
> *      *      *
>
> Appellate counsel did not challenge the State of Nevada's jurisdiction in this case. Appellant asserts that this was ineffective assistance, but he does not cite any facts or authority demonstrating that jurisdiction was improper. He therefore fails to establish that this issue had a reasonable probability of success on appeal. Our review indicates that the record contains sufficient evidence to establish jurisdiction in this case. *See* NRS 171.020; *Shannon v. State*, 105 Nev. 782, 791-92, 783 P.2d 942, 947-48 (1989); *Smith v. State*, 101 Nev.167, 697 P.2d 113 (1985).

Order Dismissing Appeal, Exh. 269, at 2-3.

In Nevada, the reach of the trial courts' jurisdiction in criminal cases is governed by NRS § 171.020, which states:

> Whenever a person, with the intent to commit a crime, does any act within this State in execution or part execution of such intent, which culminates in the commission of a crime, either within or without this State, such person is punishable for such crime in this State in the same manner as if the same had been committed entirely within this State.

///

1    NRS § 171.020.  In *Shannon v. State*, 783 P.2d 942 (Nev. 1989), the Nevada Supreme

2    Court construed NRS § 171.020, as follows:

3              The language of the statute gives jurisdiction to Nevada courts
               whenever the criminal intent is formed and any act is accomplished in this
4              state in pursuance or partial pursuance of the intent. The statute does not
               require that there be partial execution of the actual crime; it only requires
5              some carrying out of the criminal intent.

6    *Shannon*, 783 P.2d at 948. Under *Shannon*, NRS § 171.020 does not require — as

7    Bollinger asserts — that the defendant commit, in Nevada, an act amounting to an

8    element of the charged crime. *See* Reply at 6. In *Shannon*, the Nevada Supreme Court

9    held that the trial court had jurisdiction over sexual assaults that occurred in Arizona,

10   because the defendant, in Nevada, developed a scheme to separate children from their

11   parents for the purpose of sexually assaulting them. *See Shannon, 783 P.2d at 948*;

12   *see also Smith v. State*, 697 P.2d 113 (Nev. 1985) (Nevada court had jurisdiction over

13   sexual assault and attempted murder that took place in California, because the

14   defendant formulated the intent to commit a sexual assault and murder while in Nevada

15   when he kidnapped his victim and forced her into his van).

16        Bollinger argues that NRS § 171.020, as construed in *Shannon*, and as applied

17   in his case, violated the federal constitution, and he suggests that his appellate counsel

18   was ineffective for not making that argument. *See* Reply at 6-8. In making this

19   argument, Bollinger relies on *United States v. Cotton*, 535 U.S. 625 (2002); *Strassheim*

20   *v. Daily*, 221 U.S. 280 (1911); and *Ex Parte Bain*, 121 U.S. 1 (1887). Neither of those

21   cases supports Bollinger's contention. Bollinger cites no authority remotely supporting

22   an argument that NRS § 171.020, as construed in *Shannon*, and as applied in his case,

23   violated the federal constitution. Bollinger's appellate counsel was not ineffective for not

24   making that meritless argument.

25        Had Bollinger's counsel raised on his direct appeal the question of the trial

26   court's jurisdiction over his case, the Nevada Supreme Court would properly have

27   applied NRS § 171.020, as construed in *Shannon*. And, as the Nevada Supreme Court

28   held on the appeal in Bollinger's state habeas action, there is no showing that Bollinger

would have had a reasonable probability of success; "the record contains sufficient evidence to establish jurisdiction in this case." Order Dismissing Appeal, Exh. 269, at 2-3, citing NRS § 171.020, *Shannon*, and *Smith*.

The evidence showed that Bollinger was housed with James Vertrees, in the same unit, at the Washoe County Jail between January 31 and March 20, 1992. *See* Testimony of Sparks Police Detective Michael Cardella, Exh. R152, at 52; Testimony of Washoe County Sheriff's Sergeant John Spencer, Exh. R158, at 73-75; *see also* Defense Opening Statement, Exh. R151, at 13 ("It is uncontested that David Bollinger and James Vertrees were housed together in Unit 3 in Washoe County Jail between January and March of 1992."). There was evidence that, in jail, Bollinger and James Vertrees spoke about the Vertrees' motor home, which was then parked at a Reno RV park, and they discussed Bollinger moving the motor home for Vertrees when Bollinger was released from custody. *See* Testimony of Roger Dale Everidge, Exh. R159, at 9-11, 31-32.

There was evidence that, after his release from jail, Bollinger was attempting to acquire a motor home. *See* Testimony of Patricia Bramble Eich, Exh. R154, at 52-54, and Exh. R155, at 13-14; *see also* Testimony of Aurora, Colorado, Police Officer Joseph Petrocelli, Exh. R157, at 35-44 (Bollinger's statement to police, after his arrest, regarding how he claimed to have acquired the Vertrees' motor home). After he was released from jail, Bollinger lived for a time at the home of Phillip Vasko; there was evidence that, during that time, Bollinger told Vasko that he was buying the Vertrees' motor home, and he twice took Vasko to see it at the Reno RV park. *See* Testimony of Phillip Vasko, Exh. R159, at 58-69; s*ee also* Defense Opening Statement, Exh. R151, p. 13 ("It is not contested that when David Bollinger was released from the Washoe County Jail on March 20th, he moved into Phil [Vasko's] house. It's a residence in Sparks, and he stayed there over the next several-week period. And while he was there, he told him, "I'm in the process of purchasing a motor home.").

///

12

1   There was evidence that one night, sometime before James Vertrees was

2   released from jail, a "young kid" was "hanging around outside" the Vertrees' motor

3   home, watching it, and tried unsuccessfully to enter it. *See* Testimony of Karen Jamison

4   (Rose Vertrees' supervisor at work at the Peppermill hotel and casino in Reno), Exh.

5   R151, at 56-58.[4]

6   The Vertrees' motor home was moved from the Reno RV park to an RV park in

7   Sparks, Nevada, and it was from that Sparks RV park that the motor home was taken

8   and driven to Colorado. Mitchell Miller, a boy thirteen years old at the time of trial, lived

9   near where the Vertrees' motor home was parked in the Sparks RV park; at trial, he

10  identified Bollinger as a person he saw talking to James Vertrees near the motor home

11  the day before the motor home vacated the Sparks RV park. *See* Testimony of Mitchell

12  Miller, Exh. R159, at 134-40. Mitchell Miller testified that, when Bollinger and James

13  Vertrees were talking, James appeared "sad kind of," "bowing his head and shaking it

14  and stuff." *Id.* at 136. Mitchell Miller testified that when Bollinger left the RV park that

15  day, he "pealed out." *Id.* at 138.

16  Mitchell Miller's mother, Muriel Miller, testified that she spoke with James

17  Vertrees on April 28, 1992, and he did not mention that he and Rose would be leaving

18  the next morning. *See* Testimony of Muriel Miller, Exh. R159, at 115-16. There was no

19  indication that James and Rose Vertrees were preparing to leave. *See id.*

20  Karen Jamison, Rose Vertrees' supervisor at work, testified that Rose was a very

21  reliable employee. *See* Testimony of Karen Jamison, Exh. R151, at 20. Jamison

22  testified that she last saw Rose at work on Tuesday, April 28, 1992; Rose was

23  scheduled to work next on Thursday, April 30, 1992, but, without any notice, did not

24  arrive for work. *See id.* at 28-34. Jamison described it as "extremely unusual" for Rose

25  to be absent from work without notice. *See id.* at 32. April 30, 1992, was a payday for

26  _____

27  [4]Rose Vertrees evidently divorced James Vertrees. However, in this order, for
    consistency and clarity, the Court refers to Rose, as the Nevada Supreme Court did, as
28  "Rose Vertrees."

Rose, and there was a paycheck for her to pick up on that day, but Rose did not pick it up. *See id.* at 34-35.

Muriel Miller testified that on the morning of April 29, 1992, at around 6:00 to 6:30 a.m., the Vertrees' motor home pulled out of the Sparks RV park, and left in a hurry, nearly hitting her car. *See* Testimony of Muriel Miller, Exh. R159, at 112-22.

When the Vertrees' motor home left the Sparks RV park on the morning of April 29, 1992, a storage shed was left behind, nearly full of personal property. *See* Testimony of Karen Jamison, Exh. R151, at 36, 40-42, 45-47, 55-56, 58-60; Sparks Police Detective Michael Cardella, Exh. R152, at 10-12, 16-17, 48-49; Testimony of Muriel Miller, Exh. R159, at 121. Lawn chairs and steps for the motor home were also left behind. *See* Testimony of Karen Jamison, Exh. R151, at 36, 40-42; Testimony of Sparks Police Detective Michael Cardella, Exh. R152, at 10, 16. When the Vertrees' motor home was taken from its space in the Sparks RV park, its sewer and gas connections were evidently damaged; sewer line parts were left behind, cracked and broken. *See* Testimony of Sparks Police Detective Michael Cardella, Exh. R152, at 10, 17; *see also* Testimony of Rifle, Colorado, Chief of Police Daryl Meisner*,* Exh. R155, at 116-17 (receipts for motor home repair materials, dated May 11, 1992, found in motor home). Also, at the space vacated by the Vertrees' motor home, a propane gas cylinder was left behind, knocked off mounting blocks and pushed aside, with fresh scrapes and scratches on it. *See* Testimony of Sparks Police Detective Michael Cardella, Exh. R152, at 10, 16-21. Parts of a broken tail light lens were found at the vacated RV space. Testimony of Sparks Police Detective Michael Cardella, Exh. R152, at 21-25; *see also* Testimony of Aurora, Colorado, Police Detective Tony Joseph Rodriguez, Exh. R155, at 36, 63-65 (regarding damage apparent on motor home when found in Colorado). Also, directly in front of the Vertrees' space at the Sparks RV park, a square rubber grommet with a reflector was found. Testimony of Sparks Police Detective Michael Cardella, Exh. R152, at 21-24; *see also* Testimony of Aurora, Colorado, Police Detective Tony Joseph

///

14

1  Rodriguez, Exh. R155, at. 36, 63-65 (regarding damage apparent on motor home when
2  found in Colorado).

3      James and Rose Vertrees' beloved pet dog was left behind, and was found
4  wandering in Sparks during the day on April 29, 1992. *See* Testimony of Karen
5  Jamison, Exh. R151, at 43-44; Testimony of Carol J. Nye, Exh. R160, at 16-21;
6  Testimony of Monica Walther, Exh. R160, at 22-28.

7      Also on April 29, 1992, Rose Vertrees' new car was found in the parking lot, not
8  far from the Sparks RV park, without license plates; it was towed from there on May 5,
9  1992. Testimony of George Thomas Pepper, Exh. R151, at 65-70, 81-82; Testimony of
10  Sparks Police Detective Michael Cardella, Exh. R152, at 28-34, 40-43, 50-51.

11     The bodies of James and Rose Vertrees were found, burning, in and near a
12  dumpster at a highway rest area in Rifle, Colorado, on the morning of April 30, 1992.
13  Their hands were bound behind their backs with duct tape. *See* Testimony of Rifle,
14  Colorado, Police Officer Mark L. Leslie, Exh. R152, at 93-95, 109-17; Testimony of
15  Thomas M. Canfield, M.D., Exh. R153, at 55-57, 87-89. Autopsies revealed that James
16  and Rose Vertrees had been beaten to death, and were dead before their bodies were
17  set on fire. *See* Testimony of Thomas M. Canfield, M.D., Exh. R153, at 73-74, 94-96.

18     There was ample evidence at trial from which the state courts could reasonably
19  have found that, in Nevada, Bollinger formed a criminal intent, and accomplished an act
20  in pursuance or partial pursuance of the intent. *See* NRS § 171.020; *Shannon*, 783 P.2d
21  at 948.

22     The Sixth Amendment right to effective assistance of counsel encompasses the
23  right to effective assistance of appellate counsel on a first appeal as of right. *Evitts v.*
24  *Lucey*, 469 U.S. 387, 396 (1985). Claims of ineffective assistance of appellate counsel
25  are reviewed according to the standard established in *Strickland v. Washington*, 466
26  U.S. 668 (1984). *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v. Ryan*, 628
27  F.3d 1101, 1106 (9th Cir.2010). The first requirement of the *Strickland* standard is that
28  the petitioner must show that counsel's performance was objectively unreasonable,

15

which, in the appellate context, requires the petitioner to demonstrate that counsel unreasonably failed to discover and brief a meritorious issue. *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at 1106. The petitioner must overcome the "strong presumption that [appellate] counsel's conduct [fell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The petitioner must also show prejudice, which, in the appellate context, means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed on his appeal. *Smith v. Robbins*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106.

With regard to the first prong of the *Strickland* standard, the Supreme Court has instructed that appellate counsel need not, and in fact should not, raise every nonfrivolous claim. *Smith v. Robbins*, 528 U.S. at 288. Instead, appellate counsel should select from among the appealable issues "in order to maximize the likelihood of success on appeal." *Id.*; *see also Smith v. Murray*, 477 U.S. 527, 536 (1986) (The process of "winnowing out weaker arguments on appeal and focusing on 'those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.'"). A court reviewing a claim of ineffective assistance of counsel "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685, 702 (2002) (quoting *Strickland*, 466 U.S. at 689).

In this case, the question of the trial court's jurisdiction was raised by the defense before trial in a motion to dismiss for lack of jurisdiction. *See* Motion to Dismiss for Want of Jurisdiction, Exh. R39. That motion was denied. *See* Order Denying Motion to Dismiss for Want of Jurisdiction, Exh. R69. The motion to dismiss was renewed on August 1, 1994, after the State rested its case, and it was again denied. Transcript of Proceedings of August 1, 1994, Exh. R160, at 74.

///

At the evidentiary hearing in Bollinger's first state habeas action, the attorney who represented Bollinger on his direct appeal testified, and explained that he made a strategic decision not to raise the jurisdiction issue on appeal. Transcript of Evidentiary Hearing, March 3, 1997, Exh. R213, at 91-93, 103. Bollinger's appellate counsel testified, in this regard, as follows:

> Q.     A motion regarding jurisdiction was made at the trial level, was it not?
>
> A.     Yes, it was.
>
> Q.     Was it your decision not to raise that issue on appeal?
>
> A.     Yes, it was.
>
> Q.     What was the basis for that decision?
>
> A.     The basis for not raising that issue on appeal is that I felt that it did not have merit and I did not wish to raise frivolous issues before the Supreme Court. There are a variety of reasons of why I hold that position. We discussed them last week. We can go through them again now if you wish.
>
> Q.     Please.
>
> A.     Okay. I'm a firm believer that as an appellate deputy in Washoe County before the only appellate court in the State of Nevada, that one of the things that I have to do before that court and I think before any court is maintain credibility. And I don't believe that I can sustain credibility if I bombard the court with issues that I think are either frivolous or simply will not be ruled upon to the benefit of my client. And so as a consequence not every issue, I expect, that somebody wants raised, be raised, but that's — I think that's my function.
>
> Q.     Did you independently review the record for any evidence of any acts done by Mr. Bollinger within the State of Nevada?
>
> A.     Yeah, the trial — well, to the extent the trial transcript deals with the movement of the motor home from Reno to Colorado, yes.

*Id.* at 92-93.

In light of the evidence at trial, described above, Bollinger's appellate counsel's strategic decision not to raise the jurisdiction issue on appeal was well within the range of objectively reasonable professional assistance. *See Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir.1989) (appellate counsel not deficient for failing to present claim with no reasonable chance of success).

1    With regard to the second prong of the *Strickland* analysis, the petitioner must

2    show a "reasonable probability that, but for appellate counsel's failure to raise the issue,

3    the petitioner would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. at 285-

4    86; *Moormann*, 628 F.3d at 1106. A "reasonable probability is a probability sufficient to

5    undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is not enough to

6    show that counsel's errors had some conceivable effect on the outcome of the

7    proceeding, because "virtually every act or omission of counsel would meet that test …

8    and not every error that conceivably could have influenced the outcome undermines the

9    reliability of the result of the proceeding." *Id.* at 693 (internal citation omitted).

10    Bollinger was not prejudiced by his appellate counsel's decision not to raise the

11    jurisdiction issue on his direct appeal. On the appeal in Bollinger's first state habeas

12    action, the Nevada Supreme Court ruled: "Our review indicates that the record contains

13    sufficient evidence to establish jurisdiction in this case." Order Dismissing Appeal, Exh.

14    269, at 2-3 (citing NRS § 171.020; *Shannon*, 783 P.2d 942; *Smith v. State*, 697 P.2d

15    113). The Nevada Supreme Court is the same court that would have ruled on the

16    jurisdiction issue had it been raised on Bollinger's direct appeal. The Nevada Supreme

17    Court's ruling, therefore, is especially authoritative with respect to the slim probability of

18    the jurisdiction argument prevailing on the direct appeal. Certainly, in view of the

19    evidence at trial, the Nevada Supreme Court's ruling in that regard was not objectively

20    unreasonable.

21    Bollinger argues that "new evidence gathered during federal post-conviction

22    proceedings" supports his claim. *See* Reply at 3, 17-31. As the Court understands

23    Bollinger's argument, he contends his new evidence places his claim in such a new light

24    that it renders it a new claim that has not been exhausted, and that he can show cause

25    and prejudice, under *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), for his presumed

26    procedural default of the "new claim." *See id.* at 13-17. The Court finds this line of

27    argument to be without merit. With respect to the claim under consideration here — a

28    claim of ineffective assistance of appellate counsel based on appellate counsel's

18

decision not to make a jurisdiction argument on Bollinger's direct appeal — the argument Bollinger believes should have been made on his direct appeal would necessarily have been based solely on the record on appeal. *See Tabish v. State,* 72 P.3d 584, 596 n. 53 (Nev. 2003) (appellate court "cannot consider matters not properly appearing in the record on appeal"). The new evidence that Bollinger now proffers was not part of the record on his direct appeal, and it has no bearing on his appellate counsel's decision whether or not to raise a jurisdiction issue on the direct appeal. It remains that, given the evidence at trial, Bollinger's appellate counsel did not perform ineffectively in not making a jurisdiction argument on his direct appeal, and Bollinger was not prejudiced by his counsel's performance in that regard.[5]

This Court, therefore, concludes that the state court's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and was not based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d). The Court will deny Bollinger habeas corpus relief with respect to the claim in Claim 18 that Bollinger's appellate counsel was ineffective for failing to raise, on his direct appeal, a claim that the trial court did not have jurisdiction.

## C.    Claim 18 — Speedy Trial

Claim 18, when read together with Claim 2, also includes a claim that Bollinger's appellate counsel was ineffective for failing to raise, on his direct appeal, a claim that his right to a speedy trial was violated. *See* Third Amended Petition at 63-64, 195-98.

---

[5]The "new claims" that Bollinger asserts in this part of his argument (Reply at 18-27) appear to be more in the nature of claims of ineffective assistance of trial counsel than ineffective assistance of appellate counsel, and they mirror closely claims of ineffective assistance of trial counsel at Claim 5A of his third amended petition, which were held to be procedurally defaulted in the Court's December 20, 2013, order. *See* Third Amended Petition (dkt. no. 168) at 77-86; Order entered December 20, 2013 (dkt. no. 232). The Court declines to reconsider its December 20, 2013, ruling based on argument made for the first time in Bollinger's reply. *See* Reply at 27-38. The Court will, however, grant Bollinger a certificate of appealability with respect to the question whether, applying *Martinez v. Ryan*, 132 S.Ct. 1309, he can overcome the procedural default of his claims of ineffective assistance of counsel based on claimed ineffective assistance of counsel in his first state habeas action. *See infra* Part V.

1    The Nevada Supreme Court ruled on this claim, on the appeal in Bollinger's first

2    state habeas action, as follows:

3        Appellant complains that his counsel were ineffective for not
         arguing that his speedy trial right was violated. NRS 178.556(1) provides

4        in part: "If a defendant *whose trial has not been postponed upon his
         application* is not brought to trial within 60 days after the arraignment on

5        the indictment or information, the district court may dismiss the indictment
         or information." (Emphasis added.) In assessing a claim that an

6        appellant's right to a speedy trial has been denied, this court considers the
         length of the delay, the reason for the delay, the assertion of the right, and

7        prejudice to the accused. *Brinkman v. State*, 95 Nev. 220, 222, 592 P.2d
         163, 164 (1979) (citing *Barker v. Wingo*, 407 U.S. 514 (1972)).

8
9        We conclude that counsel reasonably declined to raise this issue.
         First, the trial was continued upon appellant's motion. He has not shown

10       that trial counsel acted unreasonably in obtaining a continuance and
         waiting for the state to reduce its witness list before interviewing the

11       witnesses. Second, appellant's suggestion that the state intentionally and
         improperly delayed the trial remains nothing more than rank speculation.

12       Finally, appellant fails to show prejudice. The district court found that the
         delay had no relevant detrimental effect on him, and appellant fails to

13       specify how his alleged loss of memory harmed his defense.

14   Order Dismissing Appeal, Exh. 269, at 3 (emphasis in original).

15       The Nevada Supreme Court's ruling that Bollinger's state-law speedy trial right

16   was not violated is authoritative. *See Lewis v. Jeffers*, 497 U.S. 764, 780-81 (1990)

17   (federal habeas court must respect state court's application of state law); *Jackson v.*

18   *Ylst*, 921 F.2d 882, 885 (9th Cir.1990) (federal habeas court has no authority to review

19   state court's application of state law). Therefore, to the extent that Bollinger's claim is

20   that his appellate counsel was ineffective for not raising, on his direct appeal, an issue

21   regarding his state-law right to a speedy trial, his claim fails. The Nevada Supreme

22   Court's ruling, that Bollinger's appellate counsel reasonably declined to raise a state-law

23   speedy trial issue, was not objectively unreasonable.

24       With respect to Bollinger's federal constitutional speedy trial right, guaranteed

25   him by the Sixth Amendment, the Nevada Supreme Court properly cited the governing

26   Supreme Court precedent, *Barker v. Wingo*, 407 U.S. 514 (1972), and its analysis was

27   consistent with that precedent. The Nevada Supreme Court — again, the same court

28   that would have ruled on a speedy trial claim on Bollinger's direct appeal, had one been

20

made — concluded that appellate counsel reasonably refrained from asserting a speedy trial claim on direct appeal because such a claim would have failed. This Court agrees.

Although the right to a speedy trial is "one of the most basic rights preserved by our Constitution," *Klopfer v. North Carolina*, 386 U.S. 213, 226 (1967), there is no fixed measure to determine when the right has been violated. Rather, courts apply a somewhat flexible "functional approach," weighing the various interests at stake. *Barker*, 407 U.S. at 522. The primary factors to be considered are the length of the delay, the reasons for the delay, the degree to which the defendant asserted the right to a speedy trial, and the extent of prejudice to the defendant caused by the delay. *Id.* at 530-33.

Bollinger was arrested in Colorado on May 11, 1992. After the prosecution of Bollinger in Colorado was initiated and then subsequently dismissed, a criminal complaint against Bollinger was filed in the justice court in Sparks, Nevada, on December 31, 1992 (Exh. R2). A preliminary hearing was held in the Sparks justice court on March 22, 1993 (Exhs. R6, R7), and an information was filed in the district court in Washoe County, Nevada, on April 6, 1993 (Exh. R32). Bollinger was arraigned on April 29, 1993 (*see* Exh. R8). After extensive pretrial proceedings, including pretrial motions and discovery (*see*, *generally*, Exhs. R32-R148), Bollinger's trial commenced on July 25, 1994 (Exh. R149). The first factor in the *Barker* analysis, the length of delay, is a threshold issue; unless the delay is great enough to be presumptively prejudicial, the court need not consider the remaining factors. *See United States v. Beamon*, 992 F.2d 1009, 1012 (9th Cir.1993). The delay in this case was mildly excessive, such that, in this Court's view, the other *Barker* factors do come into play. *See Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) (delays approaching one year are presumptively prejudicial).

With respect to the second *Barker* factor, the reasons for the delay, Bollinger attributes the delay to the prosecution. As the Court understands his argument, Bollinger contends that the delay was caused by the "transfer" of the prosecution from Colorado to Nevada, and, thereafter, by the State's delay in paring down its witness list.

Bollinger, however, does not point to any evidence — certainly none in the record on his direct appeal — that any delay was in bad faith, or was unnecessary to the prosecution. This was plainly a complicated case from the prosecution's standpoint: a capital case, involving the robbery, kidnapping, and killing of two people, with no eyewitnesses, in which the victims' bodies were found burned beyond recognition two states and some 800 miles away from where the crimes began. *See* Opposition to Continuance of Trial Date, filed by the Prosecution on September 20, 1993, Exh. R95. In this Court's view, the evidence in the record reflects that the overriding reason for the delay was the seriousness and complexity of the case.

The third *Barker* factor, the degree to which the defendant asserted his right to a speedy trial, weighs heavily against Bollinger. Bollinger repeatedly waived his speedy trial rights, and requested and was granted continuances of his trial over the State's opposition. *See*, *e.g.*, Transcript of Proceedings of September 10, 1993, Exh. R74; Transcript of Proceedings of September 14, 1993, Exh. R78; Motion to Continue Trial, filed by Bollinger on September 16, 1993, Exh. R88; Affidavit of Counsel in Support of Motion to Continue Trial, filed September 16, 1993, Exh. R89, at 2 ("[T]he Defendant has heretofore waived his right to a speedy trial."); Opposition to Continuance of Trial Date, filed by Prosecution on September 20, 1993, Exh. R95; Transcript of Proceedings of September 23, 1993, Exh. R98; Motion to Exclude DNA Evidence or, Alternatively, to Continue Trial Date, filed by Bollinger on October 28, 1993, Exh. R107; Opposition to Motion to Exclude DNA Evidence or to Continue Trial Date, filed by Prosecution on November 2, 1993, Exh. R109; Transcript of Proceedings of November 4, 1993, Exh. R110; Transcript of Proceedings of December 2, 1993, Exh. R111; *see also* Transcript of Evidentiary Hearing, March 3, 1997, Exh. R213, at 34, 68-69 (Bollinger's trial counsel's testimony, at evidentiary hearing in Bollinger's first state habeas action, regarding requests for continuances of trial), and at 65-66 (trial counsel's testimony regarding waivers of speedy trial rights).

///

The fourth *Barker* factor is prejudice to the defendant on account of the delay. There is no showing that Bollinger was prejudiced. On the contrary, during the year before Bollinger's trial, Bollinger repeatedly requested and was granted continuances of the trial, arguing that Bollinger would be prejudiced if the trial was not postponed. *See*, *e.g.*, Transcript of Proceedings of September 10, 1993, Exh. R74, at 8 ("Judge, I have a man's life in my hands here. I can't just go forward. I have to feel confident that we are prepared for trial."); Motion to Continue Trial, filed by Bollinger on September 16, 1993, Exh. R88; Affidavit of Counsel in Support of Motion to Continue Trial, filed September 16, 1993, Exh. R89; Transcript of Proceedings of September 23, 1993, Exh. R98, at 2 ("We just need more time to contact and interview these witnesses and conduct some further investigation that these witnesses have led to. We can't get it done by November 8th."); Motion to Exclude DNA Evidence or, Alternatively, to Continue Trial Date, filed by Bollinger on October 28, 1993, Exh. R107; Transcript of Proceedings of November 4, 1993, Exh. R110; Transcript of Proceedings of December 2, 1993, Exh. R111, at 7 ("Judge, I would prefer, as would my client, and I have discussed this with my client, but I would rather go in July at a date certain rather than set it in May or June. I mean, even if we had to go, we're not really concerned with time. Time is history at this point."); *see also* Transcript of Evidentiary Hearing, March 3, 1997, Exh. R213, at 36, 69-70 (testimony of Bollinger's trial counsel at evidentiary hearing: "In my own mind at this juncture, in light of everything that I know, he probably was not prejudiced by the delay because we at least got to be prepared. He may not have had the best factual situation, but we were prepared."). The evidence in the record, then, is that Bollinger was not prejudiced by, but rather benefitted from, the delays of the trial, which were granted at the request of the defense over the objection of the prosecution.

At the evidentiary hearing in Bollinger's first state habeas action, Bollinger's appellate counsel testified, as follows, on cross-examination, about his decision not to raise a speedy trial claim on Bollinger's appeal:

///

Q.    There are a number of motions for continuance in this case and Mr. Bollinger seems to suggest that he was denied a right to a speedy trial. Was this an issue that you considered or thought about in terms of writing the appeal here? And if not, why not?

A.    Well, yeah, I thought about it briefly, because two reasons, one, the right to a speedy trial almost, in a case like this, almost unless you can show some absolute form of prejudice, is not going to warrant relief. But more importantly in this case, if I recall correctly, there had been several motions by the defense for a continuance to prepare for trial, and those motions, when they are granted on behalf of the defendant operate to waive the speedy trial right.

Q.    Do you recall whether or not Mr. Bollinger ever identified to you witnesses who were lost or evidence that was destroyed by virtue of the delay?

A.    I don't recall that now.

Transcript of Evidentiary Hearing, March 3, 1997, Exh. R213, at 105-06.

This Court concludes that the state court's ruling, denying Bollinger relief on this claim, was not an unreasonable application of clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d). The Court will, therefore, deny Bollinger habeas corpus relief with respect to the claim in Claim 18 that Bollinger's appellate counsel was ineffective for failing to raise, on his direct appeal, a claim that his speedy trial rights were violated.

## V.    CERTIFICATE OF APPEALABILITY

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). The Supreme Court has interpreted 28 U.S.C. §2253(c) as follows:

Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir.2000).

///

The Court finds that, applying the standard articulated in *Slack*, a certificate of appealability is not warranted with respect to any of the three claims resolved on their merits in this order.

In his reply, Bollinger requests that the Court reconsider a previous ruling in this case, with respect to a procedural issue. *See* Reply at 27-38. Specifically, Bollinger asks the Court to reconsider whether, under *Martinez,* 132 S.Ct. 1309, he can overcome the procedural default of his claims of ineffective assistance of counsel based on claimed ineffective assistance of counsel in his first state habeas action. The Court declines to reconsider its ruling on that issue based on the argument made by Bollinger in his reply. *See supra* n. 5. However, the Court does find that this procedural issue meets the standard for a certificate of appealability, and the Court will grant Bollinger a certificate of appealability with respect to it.

## VI.    CONCLUSION

It is therefore ordered that the Request for Status Conference (dkt. no. 242) filed by the petitioner, David Bollinger, is denied.

It is further ordered that the third amended petition for writ of habeas corpus (dkt. no. 168), of the petitioner, David Bollinger, is denied.

It is further ordered that the petitioner, David Bollinger, is granted a certificate of appealability with respect to whether, under *Martinez v. Ryan*, 132 S.Ct. 1309, he can overcome the procedural default of his claims of ineffective assistance of counsel based on claimed ineffective assistance of counsel in his first state habeas action. In all other respects, the Court denies the petitioner a certificate of appealability.

It is further ordered that the Clerk of the Court shall enter judgment accordingly.

DATED THIS 4th day of March 2015.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE